IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

BARBARA FOURNIER, and                                    3:11-CV-00343-AC
BRUCE JENKINS,
                                                         OPINION AND ORDER
                   Plaintiffs,

TERRY CUDDEFORD, JAMIE STEIN,
and BETHANY NORBERG,

                   Defendants.

ACOSTA, Magistrate Judge:

*Introduction*

    Plaintiffs, Barbara Fournier ("Fournier") and Bruce Jenkins ("Jenkins") (collectively

"Plaintiffs") filed this § 1983 action against their former landlords, Jamie Stein ("Stein") and

Bethany Norberg ("Norberg") (collectively "Landlords"), and Terry Cuddeford ("Deputy

Cuddeford"), a deputy with the Clackamas County Sheriff's Office, alleging a violation of their

rights related to their eviction from the property located at 26948 E. Arlie Mitchell Road in

Page -1- OPINION AND ORDER                                                    {SSM}

Rhododendron, Oregon ("the Property"). Plaintiffs brought claims for violation of their right to due process under the Fourteenth Amendment and their right to be free from unreasonable searches and seizures under the Fourth Amendment against Deputy Cuddeford, and state law claims for unlawful ouster and negligence against the Landlords. Plaintiffs settled their claims against the Landlords, leaving only their § 1983 claims against Deputy Cuddeford. Presently before the court is Deputy Cuddeford's motion for summary judgment.

The court grants Deputy Cuddeford's motion. On the record before the court, his conduct did not constitute state action sufficient to support a § 1983 claim against him because he neither effected nor assisted Plaintiffs' eviction from Landlords' house on the Property. In addition, even if Deputy Cuddeford's conduct constituted state action, he is entitled to qualified immunity because it would not have been clear to a reasonable officer in his position that his conduct was unlawful given the circumstances he confronted.

*Factual Background* [1]

At the time of the events giving rise to this action, Plaintiffs were tenants[2] residing on the Property owned by the Landlords. (Fournier Decl. ¶ 2; Jenkins Decl. ¶ 2.) On July 6, 2010, Norberg called Jenkins and told him that if he did not vacate the house, she was going to come to the house with a gun and kick him out. (Jenkins Dep. 44:13-25, 45:1-10.) Jenkins called 911 to report the threat and was told to call back if Norberg actually showed up. (Jenkins Decl. ¶ 3; Cuddeford Decl.,

---

[1] Both parties have submitted documents with various attachments, including multiple excerpts of depositions, attached to different documents. Unless otherwise indicated, all of the citations are directly to the authenticated depositions, not the documents to which they are attached.

[2] For purposes of this motion, Deputy Cuddeford agrees that Plaintiffs were tenants and that the Landlords did not follow the proper procedure to conduct a lawful eviction.

Ex. A; Boone Dep. 31:14-25, 32:1-25.)

At approximately 9:00 a.m. the next day, July 7, 2010, the Landlords arrived on the Property and entered the house. (Fournier Dep. 54:7-12.) Fournier was in her bedroom on the first floor when the Landlords entered her bedroom and asked her about Jenkins. (Fournier Dep. 56:9-15.) Fournier told them Jenkins was upstairs in his bedroom, in response to which the Landlords started up the stairs. (Fournier Dep. 56:14-19.)

Jenkins was asleep in bed when the Landlords arrived, and he awoke when he heard them coming up the stairs to his bedroom. (Jenkins Dep. 61:5-7). Remembering Norberg's threat of the night before that she would use a gun to kick him out of the house, Jenkins jumped over the bannister to the landing below and ran out of the house onto an attached deck. (Jenkins Dep. 61:9-62-5.) The Landlords entered Jenkins's bedroom and began throwing his personal property, including an air conditioner, out of the house from the window of his second-floor bedroom. (Jenkins Decl. ¶¶ 4- 5; Jenkins Dep. 62-13-14; Fournier Dep. 55:7-15, 56:22-25.) While they were throwing Jenkins's belongings out the window, the Landlords yelled at him to "get off" the Property. (Fournier Dep. 58:15-22, 59:8-9, 63:10-15; Jenkins Dep. 60:21-25, 62:13-16, 64:4-15, 68:15-25, 69:1-12, 73:2-19.)

The Landlords' account of their encounter with Jenkins in his bedroom after they arrived that morning differed sharply from Jenkins's account. They had served Jenkins with a "30-Day Notice of Eviction" document on May 2, 2010. (Norberg Dep. 23:5-14.) They arrived the morning of July 7, 2010, to find Jenkins asleep in his bedroom. (Norberg Dep. 21:21-22:22.) Norberg described Jenkins's behavior as "bizarre" and "belligerent," that he was acting "like a wild man," that he was "yelling and screaming," and that he was "mumbling and incoherent." (Norberg Dep. 24:8-17.)

Jenkins then shoved Norberg into the air conditioning unit in the window of the bedroom where Jenkins had been sleeping, knocking the air conditioner out of the window and causing her to fall down several of the stairs, resulting in bruising to her arms and elbow. (Norberg Dep. 35:16-36:12.)

Jenkins testified Norberg then appeared on the deck where Jenkins sat and told him to "Get up. Get off the property. . . Get out of here." (Jenkins Dep. 64:4-7.) As she said this, Norberg slapped Jenkins on the back of his head. (Jenkins Dep. 64:8-9.) Jenkins did not respond verbally or physically to Norberg but instead walked away from the house toward the road, and sat down in front of a barn on the Property. (Jenkins Dep. 64:10-11.)

Fournier testified she saw Norberg slapping Jenkins as he sat on the deck and heard her tell him to get off the Property. (Fournier Dep. 58:22-59:1; 63:10-15.) At this point Fournier decided to call the police because the confrontation had become physical. (Fournier Dep. 59:4-15.) Fournier testified she made two calls to the police, approximately 45 minutes apart. (Fournier Dep. 65:3-14.) Fournier made the second call, to 911, at 11:05 a.m. and reported that the "landlady" was on the Property, that she had pulled the phone out and thrown the air conditioner out the window, and there was a "heated" verbal dispute that was "beginning to get physical." (Cuddeford Decl. ¶ 5, Ex. A; Fournier Dep. 59:1-15, 63:3-7, 64:10-25, 65:1-9.) Fournier placed the 911 call from a nearby grocery store because the Landlords had ripped out the phone that was inside the house. (Cuddeford Decl. ¶ 6; Fournier Dep. 65:10-22.) When Fournier returned to the house from making the second call, she saw Stein "changing the locks on the doors." (Fournier Dep. 62:22-63:2.[3])

Jenkins also had called 911. He placed his call at 10:52 a.m. and reported that his "landlady"

_____

[3] Fournier also testified Landlords began to "cut the locks to lock him [Jenkins] out" as soon as they arrived at the house. (Fournier Dep. 57:3-7.) Although her testimony about the precise point at which the Landlords changed the locks at the house varies, Fournier's uncertainty ultimately is immaterial because in either case Landlords changed the locks before Cuddeford arrived.

was tearing up the place." (Cuddeford Decl. ¶ 4, Ex. A; Jenkins Dep. 64:17, 65:9-19.) According to Jenkins, "[i]t took quite a long time for the police to get there. That's why we ended up calling so many times." (Jenkins Dep. 65:9-12.)

Deputy Cuddeford and Deputy Don Boone ("Deputy Boone") responded to Plaintiffs' calls and arrived at the Property in separate vehicles at 11:55 a.m. (Cuddeford Decl. ¶¶ 7-9, Ex. A.) Dispatch had informed the officers there had been 911 calls from two different persons about a disturbance between a landlord and tenant, originally called in as an assault. (Cuddeford Dep. 9:13-23.) When Cuddeford and Boone pulled up to the property they found both Jenkins and Fournier outside the house, sitting in front of a barn at the end of the driveway near the road. (Cuddeford Dep. 11:14-18; Cuddeford Decl. ¶ 10; Fournier Dep. 70:4-22.) Jenkins told Cuddeford he had been "pushed out, slapped down," that his belongings had been thrown from the house into the yard or put out on the deck, that some of the belongings had been broken, and "that I have to leave, they're saying." (Cuddeford Dep. 12:4-10, 13:11-14, 14:6-9; Jenkins Dep. 163:9-25, 164:1-7.) Jenkins told Cuddeford Landlords were "[f]orcing me out of the house" and he wanted Cuddeford to talk to them about "trying to kick them out of the house without – without going through the legal process[.]" (Jenkins Dep. 163:25-164:3; Cuddeford Dep. 14:4-9.)

Deputy Cuddeford went to speak with Landlords who were on the other side of the Property while Deputy Boone stayed with Plaintiffs. (Cuddeford Dep. 14:10-25; Cuddeford Decl. ¶ 11; Jenkins Dep. 66:19-20.) As he approached the house, Deputy Cuddeford saw personal property strewn about the yard that looked like it might have been thrown out of an upstairs window. (Cuddeford Dep. 20:13-25, 21:1-9.) Deputy Cuddeford found Landlords at the house; they told him they had "squatters" in their house that they were "trying to get out," that Jenkins should be arrested

for assault, and that Cuddeford should "kick them out of their house." (Cuddeford Dep. 14:10-23, 15:7-12.) When Cuddeford asked whether they had obtained a court order evicting Plaintiffs from the house, Landlords told him they had not, although they had served Jenkins with a 30-day notice of eviction. (Cuddeford Dep. 17:14-18:8; Norberg Dep. 23:5-17.)

Cuddeford told Landlords there was no evidence of an assault by Jenkins, only probable cause he committed harassment but he would not be arresting Jenkins, and he would not kick Jenkins out of the house because he knew Jenkins had legally resided there for several years. (Cuddeford Dep. 15:13-18; 21:10-22:2; Cuddeford Decl. ¶ 15-16.) He told them they would need a court order to evict Plaintiffs and he described the court process the Landlords would need to use to obtain an eviction order. (Cuddeford Dep. 18:9-18; 20:4-9.) He also told the Landlords they had to let Plaintiffs back into the house. (Cuddeford Dep. 20:10-12.) The Landlords were "very upset" that Cuddeford would not kick Plaintiffs off the property and would not arrest them. (Cuddeford Dep. 22:3-10.)

Cuddeford then returned to the front of the property where Plaintiffs waited with Deputy Boone. (Cuddeford Dep. 23:24-24:1; Cuddeford Decl. ¶ 19.) Cuddeford told Deputy Boone that he was not needed and could leave, and Deputy Boone left in his vehicle at 12:18 p.m. (Cuddeford Dep. 24:4-6; Cuddeford Decl. ¶ 20, Fournier Dep. 70:23-25, 71:1-3; (Cuddeford Decl., Ex. A.) Deputy Cuddeford told Jenkins "they [the Landlords] don't want you back here. [Y]ou can't go back." (Fournier Dep. 72:25-73:3.) He then told Fournier "They [the Landlords] don't want you back on the property either." (Fournier Dep. 73:7-9.) This was the first notice Fournier received that she was not welcome back into the house and she told Deputy Cuddeford she was not aware she had been kicked out of the house. (Fournier Dep. 73:9-12.) Deputy Cuddeford responded "Well, they

told me that they don't want you back on the property," apparently because Fournier had "stuck up for Bruce." (Fournier Dep. 73:13-14; Jenkins Dep. 66:17-23.) Fournier protested that the Landlords "can't do that," to which Deputy Cuddeford responded "Well, it's a civil matter now. . . . You're going to have to take them to civil court. . . . There's nothing I can do about it." (Fournier Dep. 129:19-130:6, 131:1-25; Cuddeford Decl. ¶ 21.) Fournier told Deputy Cuddeford "this ain't right," and he replied "Well, if I have to come back here," one or both of Plaintiffs would be arrested for trespassing or harassment.[4] (Fournier Dep. 73:21-23, 130:7-11; Jenkins Dep. 66:24-25.) Deputy Cuddeford told Plaintiffs "[t]his is their house. There's nothing I can do about it." (Fournier Dep. 130:14-15.) Deputy Cuddeford then left the Property in his vehicle at 12:20 p.m., and neither he nor Deputy Boone had any further contact with the Plaintiffs or the Landlords regarding their dispute. (Id. ¶¶ 22, 31; Cuddeford Dep. 6:1-12.)

After Deputy Cuddeford left, Jenkins and Fournier remained on the Property in front of the barn at the end of the driveway for two hours. (Jenkins Dep. 75:12-21.) Fournier walked back to the house to confront the Landlords about why they did not want her back in the house. (Fournier Dep. 66:17-21.) They told her they wanted her out of their house because she had told the police that Norberg had hit Jenkins, but had not told the police about Jenkins hitting Norberg. (Fournier Dep. 66:23-67-13; 73:24-74-7.) Because of this, the Landlords also removed Fournier's belongings from the house. (Fournier Dep. 74:16-20.) Thereafter, the Landlords allowed Jenkins to re-enter the house once to get a pair of shoes, a coat, and some other items, and told Jenkins and Fournier they

---

[4] Cuddeford denied he told Plaintiffs they had to leave or that he would arrest them if he had to return to the Property, and testified that he told Plaintiffs to wait and let the Landlords "calm down," then come back and "see if you can work things out." (Cuddeford Dep. 24:17-21; 25:8-11.) For summary judgment purposes, the court assumes as true Plaintiffs' account of their discussion with Deputy Cuddeford.

could collect their belongings that had been thrown out or removed from the house, but the Landlords told them to not "try to enter the house, that they're going to have two guard dogs. . . . [I]f we try to go inside the house and take anything." (Jenkins Dep. 69:18-24; Jenkins Decl. ¶ 16; Fournier Dep. 77:19-78:15.) Plaintiffs then borrowed a tent from an acquaintance and spent the night outdoors at a campground in Lolo Pass, where they remained for several weeks. (*Id.* at 80:9-15; Jenkins Decl. ¶ 18; Fournier Decl. ¶ 17.)

Jenkins returned to the Property approximately 15-20 times during the following week to continue to collect his personal items that were outside the house; Landlords told him that if he removed his belongings and got the place "spic and span" before the new renters arrived, he could then get the rest of his and Fournier's belongings that were still inside the residence. (Jenkins Dep. 82:15-25, 83:1-25, 84:1-25, 174:2-25, 175:1-8; Fournier Dep. 79:4-18, 80:21-22.) Fournier returned to the Property only once, when she came back the day after the incident to help Jenkins pack up their belongings. (Fournier Dep. 134: 20-25, 135:1-10, 136: 1-9.) Plaintiffs claim they were never able to retrieve the rest of their belongings. (*Id.* at 79:14.)

*Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56©. Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1146 (9th Cir. 2005). If the moving party shows the absence of a genuine issue of

material fact, the non-moving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Celotex,* 477 U.S. at 324; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.,* 343 F.3d 1107, 1112 (9th Cir.2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1284 (9th Cir.1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America,* 638 F.2d 136, 140 (9th Cir.1981). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

Deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e) (2008). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead

a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal
quotations marks omitted).

## Discussion

Deputy Cuddeford argues there was no constitutional violation because Plaintiffs are unable
to allege sufficient causation or state action to support liability under § 1983. He also contends that
if the court finds his conduct constitutes state action to support a constitutional violation, then he is
entitled to qualified immunity because the law governing his conduct was not clearly established.
Finally, Deputy Cuddeford contends that even if he is not entitled to qualified immunity, summary
judgment should be granted in his favor because his actions were justified.

I. State Action

Deputy Cuddeford's briefing in support of his motion raises a procedural issue. Despite
moving for summary judgment on all of Plaintiffs' claims, his initial supporting memorandum
addressed only the Fourteenth Amendment procedural due process claim and made no mention of
Plaintiffs' Fourth Amendment unreasonable seizure claim. Deputy Cuddeford clarified in his reply
memorandum that he indeed intended to move on both the Fourth and Fourteenth Amendment
claims, noting that the legal analysis for both claims is the same. Indeed that is the case, as the Ninth
Circuit has stated that in a case involving a private enforcement action such as the one at issue here,
"the Fourth and Fourteenth Amendment inquiries are, for all relevant purposes, the same." *Meyers
v. Redwood City*, 400 F.3d 765, 770-71 (9th Cir. 2005). This is because, "[t]he critical question .
. . is whether [Deputy Cuddeford] . . . unlawfully facilitated [the eviction], thereby unreasonably
seizing [the Property] or depriving [Plaintiffs] of property without due process of law." *Id.* at 771.

Thus, if Plaintiffs cannot establish sufficient involvement by Deputy Cuddeford, then both claims must fail.

Moving to the substantive law controlling Plaintiffs' claims, to state a claim under 42 U.S.C. § 1983 they must prove that Deputy Cuddeford, while acting under color of state law, deprived them of a right secured by the Constitution or laws of the United States. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury.  To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).  This may be established by showing that the defendant personally participated in the alleged constitutional injury or "by setting in motion a series of acts which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Arnold v. Int'l Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).  In cases where the defendant is a state officer, the determination of proximate cause is often the same as the determination of state action.  *Id.* at 1356 ("If the actions of the state officers are not the proximate cause of the plaintiffs, injuries, then there is no state action.").  Where a plaintiff seeks to hold a government official responsible for the actions of a private party, the relevant inquiry is whether the government official "became so entangled in a private self-help remedy that they may be held to answer under Section 1983[.]" *Meyers*, 400 F.3d at 771.  This inquiry is fact-specific.  *Howerton v. Gabica*, 708 F.2d 380, 383-384 (9th Cir. 1983).

The Ninth Circuit has "considered the circumstances in which a police involvement in a private enforcement action constitutes state action . . . in a line of cases involving police presence at private vehicle repossessions and evictions." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d

950, 961 (9th Cir. 2008) (Thomas, J., dissenting) (citing *Meyers*, 400 F.3d 765; *Howerton*, 708 F.2d 380; *Harris v. City of Roseburg*, 664 F.2d 1121 (9th Cir. 1981)). "These cases teach us that while mere acquiescence by the police to stand by in the case of trouble is insufficient to convert a private enforcement action into one attributable to the state, police intervention and aid does constitute state action." *Id.* (internal citation and quotation omitted). Thus, the officer commits no state action so long as he or she does not affirmatively intervene to aid the repossession or eviction in such a way that the repossession or eviction would not have occurred without the officer's help. *Meyers*, 400 F.3d at 771. Courts have sometimes found that where an officer is called to the scene because of a physical altercation or are otherwise "summoned to a scene not of their making," *Meyers*, 400 F.3d at 772, this fact can weigh against a finding of state action. *See e.g., Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005); *Jones v. Las Vegas Metro. Police Dep't*, 2012 WL 934289, *6 (D. Nev. March 19, 2012); *Arnold v. Midwest Recovery*, Case No. 09-cv-10371, 2011 WL 309000, *7 (E. D. Mich. Jan. 27, 2011).

Here, the parties' dispute distills to the same simple judicial inquiry as did the parties' dispute in *Myers v. Redwood City*: whether the law enforcement officer, here Deputy Cuddeford, affirmatively intervened to aid the eviction in such a way that the eviction would not have occurred without his help. He did not. A review of the undisputed facts in the record demonstrates that Landlords had implemented their eviction of Plaintiffs before Deputy Cuddeford and his partner ever arrived on the scene and that they arrived to find a scene not of their making.

The facts of this case are not materially distinguishable from those in *Meyers*, a repossession case where the court found that "the officers were not so enmeshed in effectuating the [seizure of property] that the deprivation . . . is attributable to the state." 400 F.3d at 771. There, Meyers had

become delinquent in making payments on her financed Lexus automobile and her credit union hired a firm to repossess the vehicle. 400 F.3d at 768. The firm's agent, Steve Bruno ("Bruno"), attempted to repossess the vehicle in the in the middle of the night by knocking on the door of Meyers's house and demanding the car's keys. *Id.* Meyers responded that arrangements had been made for payment but Bruno insisted he had a right to take the vehicle, resulting in a "heated argument." *Id.*

Meyers then told Bruno he was "trespassing" and asked that he delay repossessions until she could talk with her credit union. *Id.* Bruno refused, reiterating he was taking the car, and again demanded the car's keys. *Id.* He then walked from the doorstep to the car and began to circle it. *Id.* Meyers grabbed her keys and headed to the car to drive it way, at which point, according to Meyers, a scuffle occurred when Bruno lunged at her, grabbed her around the waist, and lifted her off her feet; Bruno's actions injured Meyers's scars from a recent surgery. *Id.* Bruno then released Meyers, who managed to get the car door open and into the driver's seat, but not before Bruno blocked the door from closing and, according to Meyers, attempted to forcibly remove her from the car. *Id.* When Meyers's mother interceded on her behalf by grabbing Bruno, Meyers started the car and began to back it down the driveway. *Id.* Because she had not closed the driver's door, the door caught on a bush and gave Bruno's partner enough time to block the driveway with his vehicle, thereby preventing Meyers from leaving with her car. *Id.* Meyers yelled for her father "to get his shotgun" and Bruno called 911, which prompted police, including the defendant Officer O'Keefe, to respond to the scene. *Id.*

Officer O'Keefe interviewed both sides. Meyers told Officer O'Keefe her version of what had occurred and showed her the injuries she suffered; Bruno showed Officer O'Keefe his

identification, explained he had been hired to repossess Meyers's car, said he had gained access to Meyers's car by using a "slim jim" tool, and then approached Meyers's house to ask her to remove her personal belongings from the car. *Id.* Bruno told Officer O'Keefe that Meyers and her relatives physically attacked him, and Officer O'Keefe noted that Bruno's chest and arms were scratched and bleeding. *Id.* Both sides showed Officer O'Keefe paperwork which they claimed established their respective right to the car. *Id.*

Both sides then told Officer O'Keefe they wanted to make a citizen's arrest on the other. *Id.* at 768-69. Officer O'Keefe apparently had concluded Bruno had a right to take the vehicle but asked him whether there was "any way [to] resolve the situation peacefully." *Id.* at 769. Bruno said he would not press charges if Meyers allowed him to take the car. *Id.* Officer O'Keefe then approached Meyers and told her "[i]t looks like this is what we are going to do here, either you are going to let [Bruno] take the car, or we are going to arrest you." *Id.* Meyers insisted on speaking with a sergeant who, upon arriving and learning of the situation, told Meyers that her "only option to avoid arrest" was to give the car to Bruno. *Id.* Meyers, feeling she "had no choice," let Bruno take her car. *Id.*

In the district court, Officer O'Keefe and the other city defendants filed a summary judgment motion based in part on the contention they had not violated Meyers's constitutional rights. *Id.* The district court denied summary judgment. The court observed that California law allowed "self-help" repossession only if it proceeded without a "breach of the peace." *Id.* Because disputes of fact existed regarding what occurred between the parties before and after the police arrived, a jury could find Bruno had no right to repossess the car and that a breach of the peace had occurred in his attempts to repossess Meyers's car. *Id.* The trial court distinguished Officer O'Keefe's and the other police officers' conduct at the scene as more than merely "standing by" in case of trouble during the

Page -14- OPINION AND ORDER                                    {SSM}

repossession, instead finding the evidence could support the conclusion the officers "took sides" on behalf of Bruno. *Id.* Specifically, the trial court observed "the officers misused their authority by intervening to assist Bruno or by intimidating Meyers so that she refrained from resisting the unlawful repossession." *Id.*

The Ninth Circuit found the officers did not violate Meyers's constitutional rights. *Id.* at 770. The court framed the "critical question" in the case as "whether the officers, who were plainly acting under color of state law, unlawfully facilitated Bruno's efforts to repossess Meyers's Lexus, thereby unreasonably seizing her car or depriving her of property without due process of law. *Id.* at 771. The court concluded the officers "were not so enmeshed in effectuating the repossession that the deprivation and seizure of Meyers's car is attributable to the state." *Id.* The court's conclusion turned on the inquiry of whether and at what point the officers may have "become so entangled in a private self-help remedy that they may be held to answer under Section 1983." *Id.*

The Ninth Circuit cited as an example of police intervention the facts in *Harris v. City of Roseburg*, 664 F.3d 1121 (9th Cir. 1981), in which the repossessor of a semi-tractor summoned police to the scene of the intended repossession in advance of the effort, to "stand by" because the repossessor "feared violence" from the plaintiff. *Meyers*, 440 F.3d at 771. Plaintiff in fact confronted the repossessor and attempted to stop the repossession effort, at which point the police officers "stepped between them and ordered [plaintiff] to stand back because [the repossessor] was there to repossess the truck." *Id.* The *Harris* court found the officers' action enough to constitute assistance in effectuating the repossession. *Meyers*, 440 F.3d at 771.

The court distinguished *Harris* on its facts. First, the "melee in Meyers's driveway was not conducted under the purview of the officers." *Id.* Second, the officers had not been "alerted in

advance" to the repossession of Meyers's car nor had they been asked to "stand by" to ensure repossession proceeded smoothly. *Id*. at 772. Third, during the repossession itself, the police officers intervened on behalf of the repossessor to prevent plaintiff from stopping the repossession of his truck; Bruno already had repossessed Meyers's car when Officer O'Keefe and the other officers arrived. *Id*. Thus in *Harris*, "the officers' presence was integral to the repossession and they were active participants in it." *Meyers*, 440 F.3d at 772.

In contrast, the officers in *Meyers* "were summoned to a scene not of their making." *Id*. A "breach of the peace" already was in progress and the officers were given conflicting stories by the participants, including whether Bruno had taken possession of Meyers's car prior to the breach. *Id*. The officers "were caught between two sections of the California Code," one which allowed a repossessor to take the collateral without a breach of the peace and a second which made repossession complete when the repossessor gets access to the car. *Id*. The officers also were confronted with the parties' competing demands to make a "citizen's arrest" of the other, which action a citizen can effect by summoning an officer to the scene and pointing out the suspect, thereby requiring the officer to make the arrest unless there was "no ground" for the arrest. *Id*.

The Meyers court summarized Officer O'Keefe's and the other officers' position between the competing sides and concluded:

> When the officers asked "Is there any way we can resolve this situation peacefully?" they were trying to extricate two citizens out of a mutually difficult situation, one that was likely to result in both of them being arrested. The officers simply presented to Meyers her options: she could assert her rights to the car, and Bruno would press charges and the officers would have to arrest her. Or, she could avoid arrest and fight Bruno and the Credit Union another day. She could, of course, have pressed her own charges against Bruno, but if he was going to the station, she was likely going with him.
>
> This looks like a no-win situation for Meyers, but it was Bruno, not the

officers, who ultimately created the Hobson's choice:  He would not effect his citizen's arrest if Meyers would let him take the car.  Meyers had to make a choice between suffering arrest (and perhaps leaving her baby), or giving up the car until the following day when she could get everything straightened out with the Credit Union. Forcing Meyers to choose between her liberty or her property was not a situation of the officers' creation but a consequence of a nasty confrontation.  Bruno simply took advantage of the situation and California law.  Had the officers declined to present the choice to Meyers, Meyers could have kept her car, but both she and Bruno would likely have ended up at the police station.  Presenting Meyers with such a choice – albeit a choice between two unpleasant consequences – does not violate her Due Process or Fourth Amendment rights.

*Id.* at 773.

*Meyers* demonstrates that in the present case, even viewing the evidence in the light most favorable to Plaintiffs, there is insufficient evidence that Deputy Cuddeford's conduct rises to the level of state action necessary to support a § 1983 against him.  First, the confrontation between Plaintiffs and Landlords began and ended before Deputy Cuddeford and his partner arrived at the Property; no part of it occurred under their purview.  There is no dispute that when Deputy Cuddeford arrived at the Property he found Jenkins and Fournier out of the house, sitting at the end of the driveway near the main road, and Landlords up at the house.  The sides no longer were yelling at or hitting each other, and Landlords no longer were throwing Jenkins's belongings out of his bedroom window or setting them on the house's deck.

Second, neither Deputy Cuddeford nor his partner had been alerted in advance by Landlords to be present and "stand by" at the Property while Landlords attempted to evict Jenkins that morning. These facts also are undisputed.  The record shows one or both sides called 911 while the confrontation was in process and the officers arrived in response to those calls, after the confrontation ended.  Thus, the presence of Deputy Cuddeford and his partner was not at the behest of Landlords or in anticipation of assisting them.

Third, Deputy Cuddeford did not intervene to assist Landlords in their efforts to evict Plaintiffs from the house. Undisputed is that before Deputy Cuddeford had arrived, Landlords already had kicked Jenkins out of their house by using, according to Jenkins, verbal commands, physical force, and threats of violence, and that Landlords had thrown or carried most all of Jenkins's personal belongings out of the house as well. Fournier also was out of the house when Deputy Cuddeford arrived; whether she had voluntarily vacated the house or did so at the insistence of Landlords is not material, because what is material – and undisputed – is that Fournier was out of the house and sitting with Jenkins at the end of the driveway when Deputy Cuddeford first arrived at the Property. Thus, Deputy Cuddeford did not remove either Jenkins or Fournier from the house, physically, by threat of force, by use of his official authority, or by his mere presence at the scene during the confrontation. In this way, Deputy Cuddeford's situation mirrored Officer O'Keefe's situation: both arrived at their respective scenes after the confrontation between the parties had concluded, neither of them had been present during the confrontation, and neither of them had taken any action to assist the repossessing party in taking back the property at issue.

Fourth, Landlords told Deputy Cuddeford in clear terms they would not allow Plaintiffs back into the house – a decision they made before Deputy Cuddeford ever arrived at the Property. Deputy Cuddeford's undisputed description of his conversation with Landlords establishes they told him they would not allow Plaintiffs back into the house and, in fact, even wanted Jenkins arrested for assault. They also told him they did not want Fournier back in the house because of her report to the police. There is no evidence in the record to suggest Deputy Cuddeford encouraged Landlords to evict Plaintiffs from the house or to prevent them from reentering the house, or that he advised Landlords they had a legal right to evict Plaintiffs which he would enforce. Thus, Deputy

Cuddeford's presence was in no way integral to Landlord's efforts to remove Plaintiffs from the house or their decision to do so.

On this point, the essence of Plaintiffs' § 1983 claims against Deputy Cuddeford bears quoting: Plaintiffs allege he violated their constitutional rights by taking an "active role in the unlawful ouster of plaintiffs from their residence[.]" (First Amended Complaint (Dkt. No. 9) ¶ 18.) Factually, then, Plaintiffs' claims require that Deputy Cuddeford ousted them from the house, but the undisputed facts demonstrate he took no role in doing so and that the ouster already had occurred by the time he arrived. Thus, just as Officer O'Keefe had arrived at Meyers's house to find the confrontation ended and Bruno in possession of Meyers's car, Deputy Cuddeford arrived at the Property to find the confrontation ended and Plaintiffs out of the house, with Landlords in possession of the house and refusing to allow Plaintiffs back into the house.[5]

Fifth, Deputy Cuddeford arrived at the Property to find a situation he had no hand in creating but which required him to choose among options the parties had created before he arrived. He encountered Plaintiffs, who felt Landlords had improperly evicted them and wanted back into the house, and Landlords, who felt Plaintiffs were "squatters" and refused to allow them to return, and wanted at least one of them arrested for assault. And just as Officer O'Keefe had in *Myers*, Deputy Cuddeford encountered conflicting accounts of what had occurred before he arrived: Landlords claimed Jenkins assaulted one of them; Jenkins claimed one of the Landlords assaulted him.[6] Faced

---

[5] Plaintiffs do not base their claims on an alleged failure by Deputy Cuddeford to place them back in the house in contravention of a legal obligation. In fact, Plaintiffs conceded at oral argument Deputy Cuddeford had no more authority to engage in that act any more than he did to help Landlords evict Plaintiffs.

[6] Jenkins provided a description to Deputy Cuddeford of his confrontation with Landlords that caused Deputy Cuddeford to believe Norberg was a "suspect" for harassment. (Cuddeford Dep.

with the choices created by the facts as he found them, Deputy Cuddeford arrested no one, took no action to force Landlords to take Plaintiffs back into their house or to force Plaintiffs out of the house. Instead, he informed Landlords of the need to follow their eviction notice with obtaining a court order to properly evict Plaintiffs and told Plaintiffs there was nothing he could do to put them back into the house because their situation was "a civil matter now." In short, he advised each side of the legal options available to them resolve their dispute, just as Officer O'Keefe had done in *Meyers*.

Plaintiffs point out Deputy Cuddeford told them he might arrest them for trespassing or harassment if he had "to come back," and argue this as action sufficient to constitute active intervention in the eviction and, thus, the state action needed to sustain their § 1983 claims, but their conclusion does not follow from Deputy Cuddeford's actions. Deputy Cuddeford came upon a scene he had no hand in creating: Plaintiffs were out of the house, most of Jenkins's possessions were in the front yard or on the house's deck, and the Landlords were in the house refusing to allow Plaintiffs to reenter. Deputy Cuddeford knew Landlords owned the house and knew they did not want Plaintiffs back in the house, and the situation he encountered held potential for further confrontation between the two sides – indeed he had been summoned to the Property in response to a report of a disturbance and possible assault. Thus, he told Plaintiffs the Landlords did not want them back in house and if Plaintiffs tried to gain entrance or remained on the Property without Landlords' permission, he would have to return and possibly arrest them for trespassing or harassment. As had the officers in *Meyers*, here Deputy Cuddeford advised Plaintiffs of their choices and the accompanying consequences. Effectively, then, Deputy Cuddeford put Plaintiffs to the same choice

15:23-16:10.)

Officer O'Keefe had put Meyers, a choice between possibly losing their liberty through arrest for trespass or harassment on the one hand, and pursuing the matter through civil action to reestablish their right to live in the house on the other.

Plaintiffs also observe that Deputy Cuddeford told them they were evicted and that they told him they could not have been evicted lawfully, thus his threat to arrest them "evicted" them on Landlord's behalf, but this argument confuses Deputy Cuddeford's warnings for affirmative conduct constituting state action. Undisputed is that Landlords owned the Property and made clear to Deputy Cuddeford they did not want Plaintiffs back in the house. He conveyed Landlords' position to Plaintiffs. He also informed Plaintiffs, according to their account, that if Plaintiffs refused to leave the Property and he had to come back in response to Landlords' call, he might have to arrest them for trespassing or harassment. Deputy Cuddeford did not tell Plaintiffs they were legally evicted or that Landlords had a legal right to evict them; instead, he told them Landlords did not want them back in the house and there was nothing he could do about it, and they, Plaintiffs, would have to go to court to obtain a remedy.

On this specific point, Plaintiffs conceded at the summary judgment motion hearing that Deputy Cuddeford could not have forced Landlords to take Plaintiffs back into the house because such action would have subjected him to liability to Landlords under § 1983 by affirmatively intervening on Plaintiffs' behalf in Landlords' eviction effort. Deputy Cuddeford thus could not have taken, and did not take, any affirmative action to benefit either side on their eviction dispute. His statements to Plaintiffs of the consequences if they remained on the Property or attempted to enter the house without Landlords' permission merely informed Plaintiffs of what could happen if he had to return in response to another call of a disturbance at the property.

Sixth and finally, Landlords reaffirmed their position directly to Jenkins and Fournier after Deputy Cuddeford left the Property, thereby leaving no doubt they, Landlords, and not Deputy Cuddeford were keeping Plaintiffs out of the house. When Fournier went back to the house and confronted Landlords, they told her in plain terms they did not want her back in the house because of the report she had made to the police. When Jenkins went to the house to collect some of his belongings, Landlords allowed him to enter for the limited purpose of getting his shoes and a jacket, but told him not to try and enter the house again and that "guard dogs" would be present to keep him out. And, before Deputy Cuddeford arrived, Landlords changed the locks in the house to prevent Plaintiffs from reentering it. The undisputed material facts establish that Landlords, not Deputy Cuddeford, at all times acted to keep Plaintiffs out of the house and did so without Deputy Cuddeford's assistance.

In sum, Deputy Cuddeford did not create or contribute to the events that resulted either in Plaintiffs' removal from the house or being prevented from reentering it. He was faced with competing accounts of the confrontation and, based on that information, took no action on behalf of either side but instead told each side their options. That the two options available to Plaintiffs might have been unfavorable – risk arrest by trying to reenter the house or staying on the Property, or temporarily be without shelter while they challenged Landlords through the civil process – does not equate to a violation of Plaintiffs' constitutional rights. Consequently, there is insufficient state action to hold Deputy Cuddeford liable under § 1983.

## II.  Qualified Immunity

Even if Deputy Cuddeford's conduct amounted to state action, he is entitled to qualified immunity. The doctrine of qualified immunity protects "government officials performing

discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, public officials are generally immune from civil liability unless their actions violate clearly established law because "a reasonably competent public official should know the law governing his conduct." *Id*. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation and internal quotations omitted).

Determining whether qualified immunity is available traditionally has required a two-prong sequential inquiry. First, the court decided whether the plaintiff has shown that a constitutional or statutory right has been violated. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the first step was satisfied, the court then decided whether the right at issue was "clearly established" at the time of the alleged violation. *Id*. The Supreme Court has since held that lower courts are no longer required to address the prongs in order but instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Ultimately, this inquiry "must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Public officials can be held liable only for violation of a right the "contours [of which are] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Id*. at 202. Therefore, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*.

{SSM}

The key inquiry in determining whether an officer has qualified immunity is whether the officer has "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002).

As of July 7, 2010, the date that this incident occurred, it was clearly established that the Fourth Amendment applies to illegal evictions carried out with the assistance of a law enforcement officer. *Soldal v. Cook County*, 506 U.S. 56, 62-63 (1992). There, a landlord physically removed the plaintiffs' trailer from a leased space without proper authority. *Id.* at 58-59. Prior to removing the trailer, the landlord notified the local sheriff's department that he would be towing away the home. *Id.* In response, three deputy sheriffs arrived and instructed the tenants not to interfere with the removal of their trailer home. *Id.* The Supreme Court concluded that even though they had not physically assisted in the eviction, the sheriff's department had enforced an illegal eviction by forcing the plaintiff to vacate the premises, and that this constituted a "seizure" within the meaning of the Fourth Amendment. *Id.* at 62-63. Though the Supreme Court did not specifically discuss the contours of the Fourteenth Amendment right to due process, it is well-established that in cases where there is police involvement in a private enforcement action, the Fourth and Fourteenth Amendment inquiries are the same. *See Meyers*, 400 F.3d at 770-71.

Though many of the cases that discuss the state-action doctrine in the repossession and self-help remedy context focus on whether a private party "has assumed the mantle of the state and can be held to answer under Section 1983 for violating the debtor's constitutional rights," two Ninth Circuit cases present "the flip side to those cases," namely, "[a]t what point have the police become so entangled in a private self-help remedy that they may be held to answer under Section 1983?" *Meyers*, 400 F.3d at 771. First, in 1981, the Ninth Circuit found that there were material issues of fact regarding whether there was sufficient state action where the police were alerted in advance to

{SSM}

the repossession, were asked to "stand by" to ensure it went smoothly, and the officers intervened

by physically stepping between the parties and asking the plaintiff to "stand back" while the creditor

repossessed the tractor. *Harris,* 664 F.2d at 1124, 1127. Most recently, in 2005, the Ninth Circuit

found that there was adequate state action where the police were "summoned to a scene not of their

making," a disturbance was underway when they arrived, they received conflicting stories regarding

whether the repossession was complete, and where each party insisted on making a citizen's arrest

of the other party. *Meyers*, 400 F.3d at 772-774. Consequently, in the Ninth Circuit, it was clearly

established at the time of the events underlying this case that so long as an officer's conduct does not

aid or encourage a private illegal eviction, the officer is not liable under § 1983 for a violation of

Plaintiffs' rights.

Even if Defendant Cuddeford's actions rose to the level of "state action" necessary to support

a § 1983 action against him, he is nevertheless entitled to qualified immunity because, given the

circumstances he encountered when viewed in the light most favorable to Plaintiffs, it would not

have been clear to him that his conduct was unreasonable. The Ninth Circuit's reasoning in *Myers*

is similarly applicable here on the issue of qualified immunity:

> Even with a copy of *Harris* in their back pockets, the officers could not have
> determined at what point in the middle of this messy repossession they
> deprived [plaintiff] of her property without due process of law. [Plaintiff]
> may have every right to be unhappy with the situation, but the officers cannot
> be faulted for attempting to settle this . . . confrontation peacefully. In these
> circumstances, it would not be "clear to a reasonable officer that his conduct
> was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

400 F.3d at 774.

When Deputy Cuddeford arrived at the Property the parties' confrontation had concluded,

Plaintiffs were out of the house and wanted back in, and Landlords were in the house and refused

to let Plaintiffs return.  Plaintiffs told Deputy Cuddeford that Landlords had unlawfully evicted them from the house; this complaint was the focus of Plaintiffs' discussion with him.  Landlords told Deputy Cuddeford Plaintiffs' were "squatters" and they wanted Jenkins arrested for assault.  With Plaintiffs out of the house and Landlords unwilling to allow them back in, the landlord-tenant dispute was concluded, at least insofar as Deputy Cuddeford's ability to act at the scene.  Indeed, he himself acknowledged this when he told Plaintiffs he could do nothing about their situation because it was "a civil matter" now.  Again, and as Plaintiffs acknowledged at oral argument, Deputy Cuddeford could no more force Landlords to take Plaintiffs back into the house than he could force Plaintiffs out of the house.  He thus took the only course he believed available to him in the circumstances, to advise both sides of their legal options through the courts to resolve their landlord-tenant stand-off.

Deputy Cuddeford's concern then became the potential resumption of the parties' confrontation, a concern well taken given Deputy Cuddeford initially had been dispatched to the Property in response to a report of an assault.  Knowing Landlords owned the Property and given their clear statements of wanting Plaintiffs off the Property, Deputy Cuddeford advised Plaintiffs of the possible, even likely, consequences to them if he returned to the Property in response to Landlords' trespassing or harassment complaint against them.  Notably, he did not arrest either Plaintiff at this time.  Instead, rather, he advised Plaintiffs they might be arrested if they renewed their efforts to enter the house or insisted on remaining on the Property, and he gave them the opportunity to retreat and continue their fight with Landlords through the courts.

Under the circumstances, it would not be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Consequently, Deputy Cuddeford did not violate Plaintiffs' constitutional rights when he advised theme their problem was a "civil matter" and informed them

of the likely consequences if they chose instead to remain on the Property and seek a self-help remedy. He is entitled to qualified immunity.

Having thus concluded that Deputy Cuddeford is entitled to qualified immunity, the court need not reach the issue of whether his actions were justified.

### Conclusion

For the reasons discussed above, defendant's motion for summary judgment (docket # 41) is GRANTED and Plaintiffs' claims are dismissed, with prejudice.

DATED this 26th day of November, 2012

_____
John V. Acosta
United States Magistrate Judge